# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 7, 2016

## STATE OF TENNESSEE v. RAMON CURRY

**Appeal from the Criminal Court for Shelby County**
**No. 13-01024        James C. Beasley, Jr., Judge**
_____

**No. W2015-01083-CCA-R3-CD  -  Filed August 15, 2016**
_____


A Shelby County jury convicted the Defendant, Ramon Curry, of one count of false imprisonment, two counts of aggravated kidnapping, and one count of aggravated assault. The trial court ordered an effective sentence of thirty years to be served at 100%. On appeal, the Defendant contends that: (1) the evidence is insufficient to support his convictions; (2) he was entitled to a mistrial because a State's witness assisted the prosecutor by carrying a box of evidence; and (3) the trial court abused its discretion by ordering partial consecutive sentencing. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

Kenneth Brashier, Memphis, Tennessee, for the appellant, Ramon Curry.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stacy M. McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION


This case arises from a September 4, 2012 home invasion during which the residents were bound and assaulted. For his role in these events, a Shelby County grand jury indicted the Defendant for three counts of especially aggravated kidnapping, one count of aggravated robbery, two counts of attempted aggravated robbery, one count of aggravated burglary, one count of employing a firearm during a dangerous felony, and two counts of being a felon in possession of a firearm.

At trial, the parties presented the following evidence: Chris Covarrubias, a Memphis Police Department officer, testified that he reported to a residence located on Crystal View Cove in response to a complaint about an armed home invasion. When officers arrived, they parked their squad cars down the street to avoid detection in case the invasion was ongoing. The officers attempted to surround the residence but were prevented from doing so by a locked gate at the rear of the house. Officer Covarrubias and another officer stood inside the carport area and looked through a window into the kitchen. From this position, Officer Covarrubias observed a man lying on the floor inside and blood splatter on the floor next to the man. Officer Covarrubias said that the carport area was lit only by the street lights and that lights were on inside the house.

When he saw the man on the floor inside the residence, Officer Covarrubias told other officers via the police radio. Within minutes of this report, Officer Covarrubias saw lights and heard sirens from multiple police vehicles arriving at the residence. A male appeared at the front door and informed the officers that two males had exited the rear of the house. Officer Covarrubias and other officers entered the residence through the front door. Officer Covarrubias first observed two juvenile males inside the living room. As he continued through the residence, he observed that the same male he had earlier seen on the kitchen floor was now standing in the kitchen wearing a white shirt covered in blood. This man, later identified as Quenton Whiting, was in a "very excited state."

Police officers searched the residence, secured the residence, and separated the witnesses to individually record their statements. Officer Covarrubias identified photographs taken of Mr. Whiting and his two sons, D.W. and K.W.,[1] taken after police had arrived on the scene. He also identified photographs taken of the residence.

Officer Covarrubias testified that, while in the kitchen of the residence, he noticed a hole in the kitchen wall that extended through the sheetrock. He noted that, when he later collected the Defendant's clothing worn the night of the home invasion, he observed a white residue on the shirt and pants.

D.W., who was seventeen at the time of the home invasion and nineteen at the time of trial, testified that in September 2012 he was living with his cousins, Quinton Whiting and K.W. He recalled that on the night of September 4, 2012, he and K.W. were at home. D.W. recalled that earlier in the evening he had gone to football practice. When he arrived home, he showered, used the computer, and then went upstairs to go to

---

[1] It is the policy of this Court to refer to minors by their initials only. Further, D.W. was Mr. Whiting's cousin, however, the two minor boys often referred to one another as brothers and D.W. referred to Mr. Whiting as his father.

bed at around 10:00 p.m. As D.W. was sleeping, he was awakened by the Defendant, who placed a gun against the right side of D.W.'s head and asked, "where the money was." D.W. said that another man was with the Defendant and both men wore ski masks. The ski masks covered most of their faces except for their eyes, lips and hair. D.W. said that he noticed that the Defendant wore his hair in "dreads." D.W. also recalled that the Defendant wore a red jacket and gray jeans.

The men continued to ask D.W. where the money was, and D.W. suggested they look in Mr. Whiting's closet. The man without the dreadlocks tied D.W.'s hands behind his back and both men grabbed D.W. by his arms and "took" him downstairs to Mr. Whiting's room. The men placed D.W. on the floor beside K.W., put a "cover" over his head, and then searched the room. D.W. stated that he did not know if there was money in Mr. Whiting's closet and was unsure why he told the intruders to look in the closet. He said that he thought the men were going to shoot him and K.W.

D.W. and K.W. next told the men to look in the garage. The Defendant picked up D.W. and dragged him outside while the other man took K.W. outside and laid them face down in the grass in the backyard. The two men then returned to search the garage. As they were lying in the grass, D.W. told K.W. to "get up and run," but K.W. was "scared" so D.W. stayed with him. After searching the garage, the Defendant picked K.W. up off the ground and walked him into the living room of the house, and the other man took D.W. into the living room. While in the living room the Defendant asked the boys about the amount of money Mr. Whiting had. D.W. recalled that the Defendant held a gun in his hand and that the other man had two guns.

The Defendant and the other intruder then took the two boys into K.W.'s bedroom and told them to lie on the bed side by side. The Defendant placed his gun on the bed before binding D.W. and K.W.'s feet together with "some tape." The two intruders then told the boys that they knew where they went to school and that the boys played football. The two men then returned to Mr. Whiting's bedroom across the hall to continue searching for money. D.W. said that the two men ransacked Mr. Whiting's bedroom. While downstairs, D.W. also noticed a hole in the wall of the kitchen that had not been there when he went to bed that night at around 10:00 p.m. He said that the hole in the kitchen wall extended through the wall to the garage.

D.W. testified that, at some point, the two men saw headlights in the driveway, turned off the lights, and waited for Mr. Whiting to enter. When Mr. Whiting entered the house, the men turned on the lights, and D.W. heard Mr. Whiting from the kitchen saying, "don't shoot, don't shoot, don't shoot." The men ordered Mr. Whiting to the ground and asked him where was "the money and stuff." Mr. Whiting told the men that he did not have any money. Several minutes later, the two intruders retrieved D.W. and

3

K.W. from K.W.'s bedroom and forced them to "hop" to the living room, where the intruders laid D.W. and K.W. down on the floor in front of the doorway leading into the kitchen. The intruders then began hitting Mr. Whiting in the head with their guns demanding to know where "the money" was and threatening to harm "your kids" if he did not disclose the location of the money. Mr. Whiting maintained that he did not have any money.

D.W. testified that the Defendant walked into the living room and poked K.W. with what appeared to be a kitchen knife. He then returned to the kitchen and hit Mr. Whiting in the head with the gun again. D.W. estimated that this occurred for approximately seven or eight minutes before he saw the police "blue lights" through the living room window. D.W. announced that there was "somebody outside," and the Defendant looked out the window and ran out the back door. D.W. then said to the other intruder, "the police is outside," and that intruder also ran out the back door.

After the two intruders fled, D.W. and K.W. untied themselves, retrieved the house key from the floor, and unlocked the front door for the police. D.W. explained that he "wiggl[ed]" his hands free, and then used a knife to cut the tape off of their feet. K.W. then went to Mr. Whiting's aid while D.W. let the police inside the residence. D.W. said that he and his cousins were all placed in separate vehicles and transported to the police station.

D.W. testified that the intruders only asked about money and did not mention drugs. He stated that he was scared during the invasion and did not feel he could leave or refuse to comply with the intruders' orders.

On cross-examination, D.W. testified that Mr. Whiting had told him that "Rodney Saulsberry" had participated in the home invasion. D.W. confirmed that Mr. Whiting, at the time of trial, was in federal custody for a drug-related offense. D.W. agreed that he did not know the Defendant before this incident and stated that he recognized the Defendant, in November 2012 while in general sessions court, based upon his lips, dreadlocks, and eyes.

D.W. testified that he told police that there were three suspects. He explained that, while the Defendant was in the garage, someone called the Defendant's cell phone, and the caller and the Defendant spoke about the Defendant's progress. D.W. agreed that the intruders put a sock in his mouth and a sock in K.W.'s mouth before they "hopped" into the living room from K.W.'s bedroom, but denied that the intruders put duct tape on his mouth or a pillow case over his head. D.W. said that Mr. Whiting's hands were tied with the cord from an iron that the other intruder had removed from the iron in K.W.'s room.

4

D.W. testified that the Defendant wore a red hoodie and grey Levi's. After reviewing his statement to police made after the incident, he agreed that he had told police that the Defendant wore a black hoodie with black sweatpants.

K.W. testified that he was fourteen years old at the time these events. He recalled being at home with his second cousin, D.W. K.W. testified that he had returned home late from football practice, showered, and gone to bed. Just before midnight, two black men, wearing ski masks and dark clothing, shook K.W. awake while asking, "where's the money?" The ski masks covered the intruders' faces except for their eyes and mouths. K.W. noted that he could also see "dreads" coming out of the sides of one of the intruder's ski mask.

K.W. testified that he had helped the prosecutor carry some boxes during the lunch break the day before. He said the boxes were "kind of open" but he did not see what was inside the boxes. K.W. identified the two boxes that he carried. The Defendant's attorney then requested a mistrial based upon the impropriety of a victim carrying the State's evidence "around the courthouse." The trial court denied the motion. Questioning resumed and K.W. said that he had offered to help the prosecutor, carried the boxes to where the prosecutor instructed, and then went to lunch. K.W. stated that he did not see any of the items contained in the boxes.

K.W. testified that he was scared when the intruders woke him up. One of the men had a sharp knife and the other a gun. The man with the sharp knife hit K.W. in the chest as he asked where the money was. The intruders walked K.W., who was unclothed at the time, to his father's bedroom, laid him on the floor, and tied his hands behind his back. K.W. recalled that it was the Defendant who bound his hands with black electrical tape. The intruders searched Mr. Whiting's closet while continuing to ask K.W. about the location of "the money" and insisting he "quit playing." The Defendant placed a gun next to K.W.'s head and told K.W. "to stop playing and tell them where it was at." K.W. fearfully told the men to "just check" in the closet. When the men found nothing, they proceeded upstairs.

K.W. testified that D.W. was with him when the intruders returned from upstairs. They laid D.W. next to K.W. on the floor. K.W. was unsure how long they were in Mr. Whiting's bedroom, but at some point the intruders took the two boys outside and laid them on the ground while they searched the garage. After searching the garage, the intruders returned to K.W. and D.W., picked them up off the ground, and walked them back into the residence. K.W. said that, as he passed the kitchen, he noticed a large hole in the kitchen wall. The intruders took the boys into K.W.'s room, laid them down, and bound their feet. The intruders waited for Mr. Whiting to return home and, when he did, the men exited K.W.'s bedroom leaving the two boys tied up on the bed.

K.W. testified that he heard Mr. Whiting enter the residence while talking on his cell phone. Next, he heard Mr. Whiting saying "don't shoot, don't shoot." K.W. then heard someone ordering Mr. Whiting to the ground. The Defendant entered K.W.'s bedroom and snatched a cord out of the iron and then left the room. K.W. suspected that the intruders would use the cord to tie up Mr. Whiting. Several minutes later, the intruders returned to the bedroom and took the boys into the living room near the doorway leading into the kitchen.

K.W. testified that he could see his father, bleeding from his head, lying on the kitchen floor. The Defendant approached K.W. and said, "your dad don't love you." The Defendant then poked K.W. in the leg with a knife at least four or five times while telling Mr. Whiting, "you better tell us where the money is." K.W. identified photographs of the knife marks left on his leg and chest. Mr. Whiting responded to the Defendant, "that's all I got." The Defendant then threatened to cut off K.W.'s and Mr. Whiting's "private." One of the men then threatened to burn the house down.

K.W. testified that the other intruder was in the kitchen holding Mr. Whiting down. The other intruder hit Mr. Whiting in the head with a gun. He also observed the intruders take money from Mr. Whiting's pocket. K.W. saw blue lights outside the window and then turned to see the Defendant run out the back door of the living room followed shortly thereafter by the other intruder.

K.W. testified that, after he and D.W. removed the bindings from their hands and feet, he went to attend to his father while D.W. let the police officers into the residence. By the time police arrived, K.W. was clothed in gym shorts. He explained that the intruders allowed him to put on gym shorts before taking him outside to search the garage. The police officers separated Mr. Whiting, K.W., and D.W., placing them in different squad cars while the police searched the residence.

K.W. testified that the police did not show him photographs of potential suspects that night, but he learned that the police had apprehended someone and the name of that person. The following day at school, K.W.'s coach searched on the computer for a photograph of the name K.W. had heard and showed K.W. a photograph of the Defendant. K.W. said that he recognized the lips, eyes, "dreads," and skin color in the photograph as the man who had held him at gunpoint the night before. K.W. testified that he later identified the Defendant while at court for the preliminary hearing. K.W. agreed that, at one point, he believed one of the suspects might have been Rodney Saulsberry, a man dating his sister at the time. Mr. Whiting, however, later showed K.W. video footage of Rodney Saulsberry who was "dark skin[ned]," and K.W. realized he could not be the other intruder because the intruder was light-skinned.

6

On cross-examination, K.W. testified that the Defendant wore a black ski mask during the home invasion. Upon reviewing his statement to the police, he stated that the ski mask was navy blue. He agreed that he was "mistaken" when he stated the Defendant's ski mask was black. K.W. could not recall what type of tennis shoes or pants the Defendant wore the night of the home invasion. After reviewing his statement, he testified that the Defendant wore black jeans and black A.C. tennis shoes. K.W. agreed that at the preliminary hearing he testified that the Defendant wore blue jogging pants. He stated that he was mistaken, not lying. K.W. also agreed that, at the preliminary hearing, he stated that he believed Rodney Saulsberry was a suspect because he had the same "color." Despite this testimony, K.W. maintained that Mr. Saulsberry was dark-skinned and that the intruder was light-skinned. K.W. said that Mr. Whiting showed him the video footage of Mr. Saulsberry after the preliminary hearing.

K.W. testified that both intruders had guns and agreed that in his police statement he said one of the intruders was unarmed. K.W. explained that initially one of the men was unarmed but that both men had guns when they were in Mr. Whiting's bedroom. He explained that, in his statement, the narrative distinguished the second suspect as "unarmed" because, initially, he was unarmed. K.W. agreed that he forgot to testify about the intruders placing a sock in his mouth and taping a pillow case around his face while they went upstairs.

Antoine Wellington, a Memphis Police Department officer, testified that he responded to a call about a home invasion. He explained that he, along with other officers, worked the perimeter of the area surrounding the residence to attempt to contain the suspect. Officer Wellington was walking north and south bound along Hickory Hill when, approximately forty feet away, he observed the Defendant, who had long "dreads," "pop up" and begin running southbound. Officer Wellington shone a light from his AR-15 on the Defendant, who then stopped, and looked at Officer Wellington. Officer Wellington ordered the Defendant to the ground, but the Defendant continued to stare at Officer Wellington before turning and running eastbound through a back yard. Officer Wellington remained at his posted location but notified other officers of the Defendant's eastbound flight.

Officer Thomas Richmond, a Memphis Police Department officer, testified that he was patrolling the area surrounding the Crystal View Cove residence for possible suspects. Over the radio he heard Officer Wellington's identification of a possible suspect and the area to which the Defendant fled. Officer Richmond began searching behind residences near Hickory Hill Street and found the Defendant hiding "up under some fence, some rocks beside one of the houses." Officer Richmond ordered the Defendant to show his hands and radioed for assistance. The Defendant yelled out, "Big

Daddy tried to rob me," and, "It's not what ya'll think." The Defendant was taken into custody and $1,061.00 was found on his person. Officer Richmond recalled that, at the time the Defendant was detained, the Defendant had "some scratches" on his face.

Christopher Sanders, a Memphis Police Department officer, reported to a residence on Crystal View Cove during the early morning hours of September 5, 2012, to collect evidence related to the home invasion. Officer Sanders identified photographs that he took of the inside of the residence, including items moved during the course of the intruders' search of the residence. Officer Sanders identified a photograph showing electrical cord that had been cut and left on the floor of the residence, as well as blood on the floor. Another photograph depicted a USB cord found on the floor. Officer Sanders also identified a photograph of a large hole in the kitchen wall. He noted that there was debris on the floor underneath the hole in the kitchen wall. The damaged wall separated the kitchen and the garage and the damage extended through the wall. There was no debris on the floor viewing the hole from the garage rather than the kitchen. Considering the location of the debris, Officer Sanders opined that the hole was made from the garage into the kitchen, leaving drywall debris on the kitchen floor.

Officer Sanders testified that he collected several knives, the electrical cord, the USB cord, and a wrist watch recovered in the back yard. Officer Sanders attempted to obtain latent fingerprints from various items found in the residence, but none of the latent prints were identifiable. Officer Sanders testified that he did not collect any duct tape or electrical tape while searching the crime scene. He stated that he did not see any tape but that he did not look through trash cans for tape.

Jeff Dennison, a Memphis Police Department officer, testified that, on September 5, 2012, he assisted the robbery investigator, Sergeant Pearlman, with the interview of the Defendant. He recalled that there was a "chalky powdery" substance on the Defendant's clothing. After issuing the Defendant the *Miranda* rights, the Defendant signed the Memphis Police Department's "Advice of Rights Form." The Defendant told the officers that he had "just left" a friend's house and was smoking a blunt or joint when an officer observed him, so he ran. In response, the officers told the Defendant that they did not believe his story, and the Defendant responded that he "can beat a charge" and "knew how the system worked." The officers then left the interview room.

Sergeant Dennison testified that Sergeant Pearlman called him back to the interview room ten minutes later because the Defendant "wanted to talk." They re-entered the interview room, and the Defendant said he wanted to tell the truth. He stated that he had purchased "some bad dope" from "Big Daddy" and wanted to be refunded his money, $5,200. He said that he "knifed played a kid" at the residence but had nothing to do with tying "someone" up. The Defendant stated that he and a "friend" went to the

8

residence, but he would not disclose the name of the "friend." He said that he and "Big Daddy" engaged in a physical altercation and then the "friend" tied up the victims. The Defendant said that he hit "Big Daddy" and that was how "Big Daddy must have received" the head injury. The Defendant explained that the damage in the kitchen was from an initial attempt to escape the residence. Sergeant Dennison explained that neither he nor Sergeant Pearlman had disclosed any of the details of the crimes to the Defendant. Sergeant Dennison testified that, after the Defendant verbally made his statement, he refused to provide a "formal typed statement."

On cross-examination, Sergeant Dennison agreed there were scratches on the Defendant's face when he was taken into custody but stated that the Defendant did not complain of any injury. He estimated that the Defendant's interview lasted approximately one hour.

Herman Robinson, a Memphis Police Department officer, testified that he reported to the residence on Crystal View Cove due to an ongoing home invasion. He approached the residence from the front and noticed a garage. Inside the garage he observed a hole in the wall and could hear noise coming from inside the house. He moved near a window on the side of the house and could hear the occupants saying, "[T]he police out there." He looked inside the windows through a crack in the blinds and saw a group of about five subjects. One black male wore a white T-shirt and the other two wore dark clothing. The faces of the men in dark clothing were partially covered and they ordered the other persons to the floor. As the men ordered the man in the white t-shirt to the floor, he said something and one of the suspects hit the man in the head with a gun. Several minutes later, he heard, "[T]hey gone, they gone," and a victim opened the front door. The victim wearing the white t-shirt told him that the suspects exited through the back of the house, and Officer Robinson radioed this information to other officers.

Officer Robinson said that later the Defendant was apprehended and that he arrived at the location as officers were putting the Defendant in a squad car. He confirmed that the Defendant "fit the description" of the suspects he had seen in the house.

The parties stipulated that the Defendant had three convictions for felony possession of a controlled substance with the intent to sell and one conviction for aggravated assault.

The Defendant presented Marc Henderson, a Memphis Police Department officer, who testified that he recorded the victims' statements. He agreed that, in his notes, he had written that Mr. Whiting stated that he was hit in the head with an "object." He

confirmed that he documented that one of the minor victims said the intruders attempted to tie him up with a piece of string.

The Defendant testified that he knew Mr. Whiting as "Big Daddy." He was introduced through a friend approximately three weeks before this incident and, during the three week period, bought drugs from Mr. Whiting to resell. His first drug transaction with Mr. Whiting occurred in the parking lot of an AutoZone store located on Getwell Road. He explained that he popped the hood of his car and Mr. Whiting approached as if the two men were working on the car. The Defendant paid Mr. Whiting $5,000 in cash for four and a half ounces of crack cocaine. Six or seven days later, the Defendant again arranged with Mr. Whiting to buy four and a half ounces of crack cocaine. This time the men met at Mr. Whiting's residence. The Defendant and his friend entered the house and exchanged $5,200 in cash for the crack cocaine.

The Defendant testified that the drugs "look good on the outside" initially but later, after leaving the Defendant's residence, he found the inside of the crack cocaine was "gummy" and "wet." The Defendant called Mr. Whiting and explained his dissatisfaction with the quality of the crack cocaine. Mr. Whiting assured the Defendant he would "make it right." The two men arranged to meet in Orange Mound the following day.

The Defendant testified that his friend drove him to meet Mr. Whiting the following day. The Defendant estimated that it was between 11:00 p.m. and midnight. The Defendant parked his vehicle in the carport, and all three men entered Mr. Whiting's residence through a door at the side of the residence. The Defendant and his friend sat down at the kitchen table and the three men "chit chatted a little bit" before Mr. Whiting returned to his vehicle to retrieve his scales. When he returned inside the house he was talking on his cellular phone. He set the scales on the kitchen table and then walked to the back of the house. Mr. Whiting then returned with the crack cocaine and measured it out for the Defendant.

The Defendant testified that he touched the drugs with his fingernail to make sure the substance was hard. He said that this portion of crack cocaine was "a little better" but "the same thing" he had been sold the previous day. The Defendant expressed his dissatisfaction with the quality of the product. He said that he had intended to buy an extra ounce, explaining that he had brought an additional $1,000 to purchase another ounce of crack cocaine but, because the drugs were not of the same quality as the crack cocaine he purchased the first time, he did not complete the transaction. This launched the two men into an argument about the quality of the crack cocaine, and Mr. Whiting became "hostile." The Defendant then told Mr. Whiting that he no longer wanted the drugs but wanted a refund of the $5,200.

10

The Defendant said that he stood up, and Mr. Whiting walked up to him "all tough," so the Defendant pushed Mr. Whiting. In response Mr. Whiting hit the Defendant in the eye, and the Defendant grabbed Mr. Whiting. The Defendant's friend attempted to break up the fight, but Mr. Whiting got "another good lick in" across the bridge of the Defendant's nose. The Defendant said that he and his friend both grabbed Mr. Whiting, causing Mr. Whiting to fall back on the kitchen floor. The Defendant said that he began telling Mr. Whiting that he was scared and asking him to "let us out the house." Mr. Whiting would not listen to the Defendant's pleas and began to engage in a fight with the Defendant again. The Defendant stated that he and his friend continued to ask the Defendant to let them leave. When Mr. Whiting refused to release them, the Defendant's friend, while restraining Mr. Whiting, instructed the Defendant to kick a hole in the wall for their escape. The Defendant kicked a hole in the wall and then rammed his shoulder into the wall repeatedly. As he was doing so, two boys appeared in the kitchen doorway, and the situation escalated with "a whole lot" of yelling and screaming.

The Defendant told the two boys that he was trying to exit the residence, and D.W. told the Defendant that the house keys were on the dresser. The Defendant retrieved the keys from a dresser located upstairs and then returned to the kitchen. The Defendant then unlocked the back door and fled. The Defendant denied tying anyone up, possessing a gun, or pointing a knife at anyone.

The Defendant testified that, after fleeing from the house, he encountered the officer who shone the light in his face. He explained that the bright light and the gun "shocked" him so he fled. He later encountered another officer who told him "don't move," so he "threw [his] hands up." He said that he attempted to tell the officers that he was buying drugs from "Big Daddy," but they told him was "doing" a home invasion.

The Defendant testified that he did give a statement to two police officers at the police station. He denied making the statements as testified to by Sergeant Dennison, stating that his testimony at trial was consistent with his statements to the police. He denied telling police that he had a knife. He testified that the police officers provided details of the home invasion to him. He stated that the police officers never asked him to sign a statement. The Defendant testified that, when he did not admit to the crimes, the officers suggested that he had committed, the officers became angry.

After hearing this evidence, the jury convicted the Defendant of the lesser-included offenses of false imprisonment (one count), aggravated kidnapping (two counts), and aggravated assault (one count). The jury acquitted the Defendant on the charges for attempted aggravated robbery, aggravated burglary, and the firearm offenses.

11

At a subsequent sentencing hearing, the trial court ordered the Defendant to serve eleven months and twenty-nine days for the false imprisonment conviction, fifteen years for each of the aggravated kidnapping convictions, and thirteen years for the aggravated assault conviction. The trial court considered consecutive sentencing and ordered the two fifteen-year sentences for the aggravated kidnapping convictions to run consecutively to one another but concurrent to the other sentences for an effective sentence of thirty years in the Tennessee Department of Correction. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that: (1) the evidence is insufficient to support his convictions, (2) he was entitled to a mistrial because a State's witness assisted the prosecutor by carrying a box of evidence; and (3) the trial court abused its discretion by ordering partial consecutive sentencing.

### A. Sufficiency of the Evidence

The Defendant asserts that the State's evidence is insufficient to sustain his convictions. Specifically, he attacks the credibility of the State's witnesses, D.W. and K.W., as "completely and utterly unbelievable" due to inconsistencies and the State's failure to call Mr. Whiting as a witness. The State responds that any question about the credibility of the victims was resolved by the jury and that the State is not required to call every victim as a witness. We agree with the State.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id*. at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

12

To the extent that the Defendant's complaint challenges discrepancies in the victims' testimony, we reiterate that issues of credibility are resolved by the jury. As the Defendant points out, there are discrepancies between the victims' testimony and prior testimony or statements. All questions of credibility raised, however, are determined by the jury, which is the "primary instrumentality of justice" in matters of credibility of witness testimony. *Bolin*, 405 S.W.2d at 771; *see also, Bland*, 958 S.W.2d at 659; *Liakas*, 286 S.W.2d at 859. As to the Defendant's concern regarding Mr. Whiting's absence from the trial, we note that the State, in proving its case, was not required to call any particular witness, including a victim. Further, the jury was aware of the Mr. Whiting's federal incarceration at time of the trial and the trial court provided a missing witness instruction to the jury.

## 1. False Imprisonment

The Defendant was indicted for the especially aggravated kidnapping of Mr. Whiting, and the jury convicted the Defendant of the lesser-included offense of false imprisonment. To sustain a conviction for false imprisonment, the State was required to prove that the Defendant "knowingly remove[d] or confine[d] another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302(a) (2014).

The evidence, viewed in the light most favorable to the State, showed that the Defendant held Mr. Whiting at gunpoint, ordered him to the ground and bound him with a cord from an iron. From this evidence, a jury could find beyond a reasonable doubt that the Defendant knowingly removed or confined the victim unlawfully so as to interfere substantially with Mr. Whitings liberty, in violation of Tennessee Code Annotated section 39-13-302.

Accordingly, we conclude that the proof is sufficient to support the Defendant's conviction for false imprisonment beyond a reasonable doubt.

## 2. Aggravated Kidnapping

The Defendant was indicted for the especially aggravated kidnapping of D.W. and K.W. and the jury convicted the Defendant of the lesser-included offenses of aggravated kidnapping of D.W. and K.W. A person is guilty of aggravated kidnapping who commits false imprisonment while "in possession of a deadly weapon or threatens the use of a deadly weapon." T.C.A. § 39-13-304(a)(5) (2014).

The evidence, considered in the light most favorable to the State, showed that the Defendant held both victims at gunpoint as he searched Mr. Whiting's residence for

money. The victims were both bound and forced to move about the residence and property at gunpoint. The Defendant poked K.W. with a knife while demanding that Mr. Whiting disclose where "the money" was located. The Defendant threatened genital mutilation if Mr. Whiting failed to comply. From this evidence, a jury could find beyond a reasonable doubt that the Defendant knowingly confined D.W. and K.W. while possessing a deadly weapon and threatening the use of a deadly weapon.

Accordingly, we conclude that the proof is sufficient beyond a reasonable doubt to support the Defendant's convictions for aggravated kidnapping.

### 3. Aggravated Assault

The Defendant was indicted for aggravated robbery and the jury convicted the Defendant of the lesser-included offense of the aggravated assault of Mr. Whiting. As provided by statute, a person commits aggravated assault when he or she "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101," and "use[s] or display[s] a deadly weapon . . . ." T.C.A. § 39-13-102(a)(1)(A)(iii) (2014). Under Tennessee Code Annotated section 39-13-101(a)(2), a person commits assault when he or she "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury . . . ." Therefore, the elements of aggravated assault are: (1) intentionally or knowingly causes reasonable fear of bodily injury; and (2) causes fear by use or display of a deadly weapon. Bodily injury "includes a cut, abrasion, bruise, burn or disfigurement, and physical pain . . ." T.C.A. § 39-11-106(a)(2) (2014).

The evidence, considered in the light most favorable to the State, showed that the Defendant hit Mr. Whiting in the head with a gun, causing a bleeding wound. The Defendant also threatened to harm Mr. Whiting's son, K.W., while brandishing a knife and poking him with the knife. From this evidence, a jury could find that the Defendant intentionally or knowing caused Mr. Whiting to fear imminent bodily injury when he hit Mr. Whiting in the head with a gun and threatened to mutilate Mr. Whiting with a knife.

Accordingly, we conclude that the proof is sufficient beyond a reasonable doubt to support the Defendant's conviction for aggravated assault.

### B. Motion for Mistrial

The Defendant asserts that the trial court erred when it denied his request for a mistrial based upon K.W. carrying boxes containing evidence for the State. The State responds that the Defendant has not demonstrated a miscarriage of justice warranting a mistrial. We agree with the State.

14

The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. *See Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A mistrial is appropriate "when the trial cannot continue, or, if the trial does continue, a miscarriage of justice will occur." *State v. McPherson*, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision of whether to grant a mistrial is within the sound discretion of the trial court. *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only if there is a manifest necessity for such action. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). One description of manifest necessity is that, "[i]f it appears that some matter has occurred which would prevent an impartial verdict from being reached," a mistrial must be declared. *Id.* Additionally, a manifest necessity exists when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. Crim. App. 1981). The burden of establishing a manifest necessity lies with the defendant. *State v. Seay*, 945 S.W.2d 755, 764 (Tenn. Crim. App. 1996). This Court will not disturb that decision unless there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990); *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

We conclude that the Defendant has not shown a clear abuse of discretion by the trial court. K.W. testified that he offered to help the prosecutor carry some boxes during the lunch break the day before. He said the boxes were "kind of open" but that he did not see the contents nor did he know the contents of the boxes. He explained that the extent of his contact with the boxes was to carry them for the prosecutor and then place the boxes "in [the prosecutor's] room on the floor." The two boxes contained the Defendant's clothing at the time of his arrest, a knife, a USB cord, and a man's watch. At trial, K.W. described what the Defendant wore and what occurred that night but was never asked to identify the contents of either box. Further, identity was not at issue at trial as the Defendant testified that he was present in Mr. Whiting's residence at the time the police arrived.

Accordingly, we conclude that the trial court did not abuse its discretion in denying the Defendant's motion for a mistrial.

## C. Sentencing

The Defendant asserts that the trial court erred by ordering his convictions for aggravated kidnapping to run consecutively. He argues that the trial court failed to make sufficient findings to support consecutive sentencing. The State responds that the trial court made all necessary findings and asks this Court to affirm the sentences.

15

At the sentencing hearing, the State submitted certified copies of six of the Defendant's prior convictions and the presentence report. The presentence report stated that the Defendant was thirty-nine years old at the time of sentencing and that his criminal history began as a juvenile. The Defendant's criminal history spanned ten pages of the presentence report, with thirty-one prior convictions including drug convictions, aggravated burglary, aggravated assault, and multiple weapons offenses. The report showed a sparse employment history for the Defendant during his adulthood. The Defendant's wife, Ms. Curry, testified that she and the Defendant had one son together. She had three additional sons and the Defendant had four step-sons and one daughter. Ms. Curry described the Defendant as a "good father" to their children and said that none of their children had ever "got in any trouble." Ms. Curry was the owner of Kiddie Cuddles Childcare and worked the third shift at Blues City Brewers to support their family. Ms. Curry was aware of the Defendant's drug dealing, but the children were not. Ms. Curry told the Defendant he needed to "get a real job." She discussed different programs and classes the Defendant had taken in attempting to obtain gainful employment. The day of the Defendant's arrest, Ms. Curry received a phone call about possible employment for the Defendant as a forklift operator.

In the Defendant's statement of allocution, he acknowledged that he had been attempting to gain lawful employment but felt he was a "liability" to his wife and so "went back to do what [he] used to do."

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

In *State v. Bise*, the Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" 380 S.W.3d 682, 708 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Shaffer*, 45 S.W.3d at 555; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10.

16

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. As it relates to this case, the trial court found the following criteria applicable:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
>      . . . .
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

T.C.A. § 40-35-115. These criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. *See id.*; *State v. Denise Dianne Brannigan*, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *19 (Tenn. Crim. App., at Knoxville, June 13, 2012), *no Tenn. R. App. P. 11 application filed*. The imposition of consecutive sentencing, however, is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed [.]" T.C.A. § 40-35-103(2), (4). We review a trial court's decision to impose consecutive sentences for an abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3rd 851, 860 (Tenn. 2013).

At the sentencing hearing, the trial court made the following findings as to consecutive sentencing:

> [B]ased upon the testimony and a review of the record in this case [the Defendant] has made a living, a professional living, devoted to his life of involvement in selling of drugs.
>
> The Court also finds that he has an extensive criminal history. His record of criminal history is extensive. At his age that's all he's been doing since he was a juvenile.

17

Finally, the Court finds that this is a dangerous offender and this behavior in this particular case indicates little or no regard for human life and no hesitation about committing this offense which the risk to human life, in particular these two juveniles, was very high.

The circumstances surrounding the commission of the offense was aggravated. In my opinion, placing those in the situation that they were placed in, under the circumstances that they found themselves, again, awaken from sleep in their own beds, subdued, threatened. There was testimony about threats . . . if I remember one of them correctly, about bodily mutilation. They observed what was happening to their father. They both testified that they feared for their life. I find that to be extremely aggravated for young men to have to face those kinds of things at their age.

I find that confinement for an extended period of time is necessary to protect society from [the Defendant's] obvious unwillingness to lead a productive life. And that he has resorted to criminal activity in furtherance of an anti-societal life-style.

And I guess really the sad part is that, you know, I listened to the testimony of his wife who is working very hard to try to keep a family together and [the Defendant's] only reaction in response and I can understand their frustration when your wife is doing all of these things and you're doing nothing except the only thing you know how to do is sell drugs and he made a rational choice again. And we get back in the drug world and this is what happened. And so, I mean, it was a complete judgment decision on his part.

And finally, the aggregate length of the sentence reasonably relates to this offense for which he stands convicted.

Our review of the record reflects that the trial court specifically addressed the sentencing factors and principles in ordering consecutive sentencing. The pre-sentence report clearly reflects the Defendant's long history of criminal offenses, including no less then thirty-one convictions. The Defendant's criminal record began when he was a juvenile, and he was almost forty years old at the time of sentencing for these offenses. The Defendant, during his allocution, admitted that he relied on illegal drug sales for income. Therefore, the record supports the trial court's findings that the Defendant had an extensive record of criminal activity and that the Defendant's criminal acts were a source of livelihood.

As to the trial court's finding that the Defendant is a dangerous offender, the facts contained in the record show that the Defendant entered a residence at night where two minor boys were asleep. The Defendant brandished two different weapons and used a gun to force D.W. and K.W. to move about the residence in search of money. The Defendant also used the weapons to threaten and hit Mr. Whiting. The Defendant poked the minor victim, K.W., with a knife and threatened genital mutilation if Mr. Whiting did not disclose the location of money in the residence. These facts support the conclusion that the sentence imposed was necessary to protect the public and reasonably relates to the severity of the offense. *See State v. Wilkerson*, 905 S.W.2d 933, 938-39 (Tenn. 1995).

Accordingly, we conclude that the record demonstrates that consecutive sentencing was appropriate in this case and that the trial court did not abuse its discretion when it imposed consecutive sentences. The Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE